FILED

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

JAN 3 0 2013

CLERK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |  |
|---|---|---|
| JOY R. WHIPPLE, M.D., | * | CIV. 10-5075 |
| Plaintiff, | * | |
| vs. | * | REPORT AND RECOMMENDATION |
| UNUM LIFE INSURANCE COMPANY OF AMERICA, | * | |
| Defendant. | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Pending are the parties' cross motions for summary judgment.[1] To support its motion Unum filed a Memorandum, a Statement of Undisputed Facts and the Affidavit of Teresa Ward with attached exhibits.[2] To support her motion Whipple filed a Memorandum, a Statement of Material Facts and the of Affidavit of Shiloh McNally with attached exhibits.[3] Unum filed responses to Whipple's Statement of Facts and a Memorandum opposing Whipple's Motion for Summary Judgment.[4] Whipple filed responses to Unum's Statement of Facts and a Memorandum opposing Unum's Motion for Summary Judgment.[5] Each party also filed reply briefs and supplemental affidavits.[6] For the reasons stated below, it is respectfully recommended to the District Court that

---

[1]Docs. 63 and 68.

[2]Docs. 64, 65, and 66.

[3]Docs. 69, 70, and 71.

[4]Docs. 72 and 73.

[5]Docs. 74 and 75.

[6]Docs. 77, 78, 79, 80 and 82.

Whipple's Motion for Summary Judgment be GRANTED and Unum's Motion for Summary Judgment be DENIED.

**JURISDICTION**

A beneficiary of a plan may bring a civil action to recover benefits due from the plan.[7] The district courts of the United States have exclusive jurisdiction of civil actions brought by a beneficiary of a plan.[8] A civil action may be venued where the breach took place.[9] Jurisdiction exists without respect to the citizenship of the parties or the amount in controversy.[10] The court in its discretion may award attorney's fee and costs of the action to either party.[11] This case is pending before Judge Viken who referred the cross motions for summary judgment to the undersigned for a recommendation pursuant to 28 U.S.C. § 636(b).[12]

**BACKGROUND**

Joy Whipple is a medical doctor who worked as an anesthesiologist in her employment with West River Anesthesiology Consultants, P.C., in Rapid City, South Dakota.[13] West River carried a long term disability policy with Unum under which Whipple was a covered employee.[14] Whipple

---

[7] 29 U.S.C. § 1132(a)(1)(B).

[8] 29 U.S.C. § 1132(e)(1).

[9] 29 U.S.C. § 1132(e)(2).

[10] 29 U.S.C. § 1132(f).

[11] 29 U.S.C. § 1132(g).

[12] Doc. 76.

[13] Doc. 66-1, pp. 300-301. Citations to the record are made to the Page ID # listed at the top of the CM/ECF filed documents.

[14] Doc. 66-1 generally.

suffered from ongoing abdominal and pelvic pain.  At age 39, she was diagnosed with an ovarian cyst which was surgically removed on November 30, 2009.[15]  She was out of work until December 21, 2009, when she resumed work full time.[16]  She worked until January 25, 2010, when she "was scheduled but unable to work on January 27, 2010."[17]  At that time she took a medical leave of absence from her practice.[18]  She eventually withdrew from her medical group after her medical group notified her she should return to work or withdraw from the group by June 1, 2010.[19]  Before she withdrew from her medical group she claimed long term disability benefits from Unum.[20]  Unum paid some long term disability benefits, but then terminated benefits.[21]  This lawsuit followed.

## THE ADMINISTRATIVE RECORD

**Whipple's Personal History**.

Dr. Joy Whipple graduated from Ross University School of Medicine in 1998.  She was accepted into a residency program at Yale University School of Medicine, Department of Anesthesiology where she became chief resident.  She began work for West River Anesthesiology Associates, P.C. as an anesthesiologist on July 15, 2003.  Joy Whipple was a 10% owner of West River Anesthesiologist Consultants earning a monthly salary of $22,500.  In 2010 she also received

---

[15]Doc. 66-1, p. 302.

[16]*Id.*

[17]Doc. 66-1, p. 306.

[18]*Id.*

[19]Doc. 66-2, p. 575.

[20]Doc. 66-1, p. 306 & pp. 352-364.

[21]Doc. 66-2, pp. 534-536; and pp. 561-565.

$29,058 as a bonus.[22]  At times pertinent she was 39 years of age,[23] five feet six inches tall, weighing

128 pounds,[24] a mother,[25] and married.[26]  She is Board Certified in anesthesia and a "Diplomat

ABA."[27]  Her medical history includes chronic pelvic pain, passing a common bile duct stone, C-

section in 2006, hysterectomy in 2006, pelvic hematoma in 2007, and removal of hemorrhagic cyst

together with incidental appendectomy in 2009.[28]

### Chronological Overview of Whipple's Medical History and Conditions.

In December, 2006, she underwent an abdominal hysterectomy.  A pelvic hematoma was

irrigated and removed later as a result of off and on pelvic pain.  Matters stabilized until 2009.  She

developed abdominal distention requiring her to wear clothes two sizes larger than her regular pant

size.  She experienced nausea and a sense of fullness.  Eating became difficult.  At times she

developed a diffuse rash over her abdomen, hives on her chest, arms and legs and a few episodes of

angioedema with mucosal edema, throat tightness and facial swelling.  She experienced problems

with sleep.  She experienced frequent urination during nights.  By mid-November, 2009, she

experienced pain she described as unrelenting, burning pain that was present most of the time.  She

also experienced muscle fatigue and aches.

---

[22]Doc. 66-1, p. 357.

[23]Doc. 66-1, p. 301.

[24]Doc. 66-1, p. 359.

[25]Doc. 66-1, p. 354.

[26]Doc. 66-1, p. 409.

[27]Doc. 66-1, p. 404.

[28]Doc. 66-1, p. 409.

On November 23, 2009, she was seen at a pain clinic by Dr. Nesbit who assessed her as having neuritis in the abdomen.

On November 24, 2009, a pelvic CT was taken.

On November 28, 2009, she reported to the emergency room at the hospital with complaints of severe pain.  An ultrasound revealed a collapsing or ruptured left ovarian cyst.

On November 30, 2009, a left Salpingo-Oophorectomy was performed, i.e. removal of the ovary and its uterine tube.  During the procedure it was noted that she had a hemmorhagic cyst of the left ovary; omental adhesions in the right upper quadrant and centrally.  Her bowel returned to a more normal configuration after the adhesions were removed.

On December 11, 2009, Whipple began consulting with Dr. Jamie Schaeffer.

On December 21, 2009 she returned to work.

On December 31, 2009, she followed up with Dr. Nesbit reporting constant abdominal pain. Medications were adjusted because she was having tolerance issues with medications previously prescribed.  Dr. Nesbit diagnosed myofascial pain, muscle spasm and pubic neuritis.

On January 10, 2010, she consulted with Dr. Gary Christiansen at Black Hill Urology, P.C. regarding frequent urination.

On January 11, 2010, Dr. Schaeffer assessed Whipple's pain as likely becoming chronic pelvic pain.

On January 12, 2010, Whipple was seen by Dr. Christianson, OB/GYN, for her post operative visit.  Dr. Christianson noted a diffuse rash over Whipple's abdomen and continued complaints of pelvic and abdominal pain.  There was marked tenderness upon palpation.  Dr. Christianson diagnosed chronic pelvic pain, endometriosis, and history of adenocarcinoma in situ.  She observed

the differential diagnosis is quite large and recommended a followup with Dr. Nesbit at the pain clinic and a possible GI consultation.

On January 20, 2010, Whipple consulted with Dr. Gary Christiansen, Urologist, who felt she had an overactive bladder but was not sure how this condition related to her pelvic pain. Dr. Gary Christiansen thought there could be some interstitial cystitis happening, but she did not meet the criteria for that diagnosis.

On January 21, 2010, Whipple consulted with Dr. Stelzle, Allergist. He noted a rash on Whipple's abdomen and light blotchy spots which are not hives.

On January 25, 2010, Whipple took a medical leave of absence from her medical group.

On January 29, 2010, Whipple returned to the pain clinic with Dr. Nesbit. Prescriptions are changed.

On February 4, 2010, Whipple notified Unum of her intent to file a long term disability claim.

On February 8, 2010, Dr. Schaeffer assessed Whipple with disability secondary to her chronic pelvic pain.

On February 10, 2010, Whipple provided her narrative explanation to Unum about her condition.

On March 5, 2010, Whipple consulted with Dr. Nesbit at the pain clinic. Dr. Nesbit assessed her as having neuritis in the abdomen and pelvic area. Her prescriptions were adjusted.

On March 26, 2010 Whipple underwent a transvaginal ultrasound pursuant to the recommendation of Dr. Beshara, OB/GYN. Small follicle cysts are noted.

On March 26, 2010, Whipple started physical therapy. The physical therapist noted several trigger point findings.

On April 8, 2010, Whipple consulted with Dr. Schaeffer. Prescriptions were adjusted.

6

On April 28, 2010, a Unum medical consultant talked to Dr. Schaeffer on the phone.  Dr. Schaeffer did not feel Whipple could return to work and did not know when she would be ready to return to work.

**Joy Whipple Narrative.**

According to her own narrative,[29] [30] Whipple began experiencing significant abdominal and pelvic pain in February, 2009.  Her pain was vague, but intense and deep, lasting from hours to days and associated with substantial abdominal distension (two pant sizes larger) and nausea.  Her gastroenterologist ordered laboratory studies and imaging studies, none of which revealed an explanation for her symptoms.  Irritable bowel disease was suggested and dietary modifications were recommended.  Despite strictly following the recommended dietary modifications, her pain and other symptoms persisted.

Over the next several weeks her symptoms waxed and waned.  She developed a rash on her abdomen and recurring hives on her chest, arms, legs and abdomen.  She experienced a few episodes of full-blown angioedema with mucosal edema, throat tightness, and visible facial swelling.  She began to have trouble sleeping because she was bothered by pain.  She was unable to get comfortable and she awakened several times a night to urinate.  She dismissed these symptoms as side effects of her ongoing pain.

---

[29]Doc. 66-1, pp. 353-355.

[30]Her medical opinions are disregarded, even though she is by training and experience qualified to express them.  The policy provides:

"Unum will not recognize you . . . as a physician for a claim that you send to us."

On advice from her gynecologist she took birth control medication on a three month trial basis as it was thought birth control medication could improve her level of pain if an ovarian cyst or endometriosis were involved. Her condition worsened significantly.

By mid-November, 2009, the pain developed to an unrelenting burning quality which was present most of the time, limiting her activities both at work and at home. She experienced moderate difficulty getting around and noticed muscle fatigue and aches about half way through her day. She rested and elevated her legs periodically and asked for help when possible. Sitting for more than thirty minutes caused extreme buttocks pain and worsened her radiating back pain which came from exertion. Walking became more difficult for even short distances as the pain began spreading into her groin, genital area, buttocks, inner and back of her thighs, her low back area and there was a sharp searing pain directly over her pubic bone. She began to periodically use narcotic medicines because Tylenol and Motrin offered no relief. She applied hot packs to her abdomen and pelvic area several times a day.

Whipple made an appointment to establish a primary care physician and contacted her physician group's Pain Management Clinic. Within a week she found herself in the emergency room with an acute exacerbation of her pain. She was treated with high doses of I.V. narcotics. She was diagnosed with an ovarian cyst. Two days later at work she was unable to tolerate the pain and underwent emergent diagnostic laparoscopy by two physicians, an OB/GYN and a General Surgeon. The ovarian cyst was hemorrhagic and was removed together with the ovary. An appendectomy and lysis of adhesions were also performed at the same time.

Whipple's pain did not improve, but progressed. The severity and frequency were increasing. Socially, she missed all the usual holiday gatherings, including one she hosted. She also missed her father-in-law's funeral.

8

Work became increasingly difficult.  Operating room directors both at the main hospital and same day surgery commonly inquired about the state of her health and whether they could do anything to help.  A few patients inquired whether she felt ok or was having a bad day.  Twice she was late for work.  She experienced close calls with potential medication errors.  She believes that the degree of her pain and illness impacts her ability to provide appropriate patient care and even poses a threat to their safety while under her care.  Her constant pain, and episodes of severe pain which require narcotic therapy and rest, pose an obstruction to performing the mental and physical aspects of her job.  She has difficulty standing, walking, or sitting for prolonged periods of time.  She would not want someone in her current state of health as her work partner and would certainly not want that person responsible for the medical care of any of her family.  Her career has brought her personal, social, and monetary rewards.  She is highly motivated to work and is actively trying to improve the state of her health.

In response to Unum's May 17, 2010, letter telling Whipple that the benefits she was awarded per Unum's May 7 letter would no longer be paid, Whipple wrote to Unum to express her disagreement and to request an appeal of the decision.  Whipple asserted that Unum's justification for denying benefits— "No clinical support for the level of pain,"— is

> unquestionably discriminatory against sufferers of chronic pain syndromes.  One cannot document by radiological or laboratory, or other clinical data the extent of one's discomfort.  The mere fact that I have seen several specialists for my condition supports rather than disclaims my disability.  I am unable to identify any part of my policy stating an exclusion for pain syndromes.[31]

She argues that lack of reproducible pain on abdominal exam does not suggest a nonexistent condition, but rather suggests a primary pain pathway of spinal cord or central origin.  Lack of

---

[31]Doc. 66-2, pp. 569-571.

9

reproducible pain on abdominal exam, Whipple also argues, is contrary to the in house physician's suggestion of a myofascial component because myofascial pain is by definition palpable and reproducible pain.  She referred Unum to her own Dr. Nesbit's assessment of a neuritis condition at nearly every office visit.  She also suggested that since narcotics provided only marginal relief, that fact is highly supportive and classic for pain neuropathic in origin.  She noted her own training and experience as support for her own level of confidence about her arguments.[32]  Whipple expressed puzzlement that a physician could make a diagnosis contrary to her treating physician's diagnosis without examining her.  She complained that she had not even been allowed to discuss her claim with any of Unum's physicians.

Whipple asserts the comments about a lack of cause for her pain are not appropriate.  She experienced progressive pain for several months.  A moderately large hemorrhagic ovarian cyst was surgically removed.  Free blood was found in the peritoneal cavity.  Blood in the peritoneal cavity is highly painful and pro-inflammatory.

---

[32]Recall that Unum's policy provides that Whipple's medical opinions are disregarded as those of a physician even though as an anesthesiologist she is uniquely positioned to know about pain and how to prevent pain.  Nonetheless, she is entitled to make arguments to her insurer to support her claim just like any claimant who is not a physician.

She also argues she meets all the criteria for a potential diagnosis of RSD[33] or CRPS[34] which were mentioned by Dr. Nesbit as possible explanations for her pain.

Whipple points to her medical records to support the existence of pain. Dr. Rochelle Christensen said the reason for surgery was severe pain. Dr. Christensen noted severe pain on examination. Her follow up notes document progressive post-operative deterioration. Whipple's pain clinic notes with Dr. Nesbit from before her surgery in November 2009 until March 2010 document ongoing disabling pain not responsive to pharmacological intervention. Dr. Schaeffer documents Whipple's physical limitations resulting from her level of pain.

Whipple argues the cognitive deficit issue is self explanatory, even though it is not her primary complaint which prevents her from working at her job.

> Common sense should prevail here. I did not have a stroke or similar condition damaging my measurable intact cognitive ability, but seriously, what do you think? Do you want me taking care of you or your loved ones? Should patients really be asked to trust their life to a physician that they have to ask if she is O.K. and who can obviously barely walk, or stand at times?

About medication related mental impairment, Whipple said that at no time while working did she ever use any narcotics. She is reluctant to use narcotics not only because they have been only

---

[33]Reflex sympathetic dystrophy. "A syndrome of pain and tenderness, usually to a hand or foot, associated with vasomotor instability, skin changes and rapid development of bony demineralisation (osteoporosis). Frequently will follow a localised trauma, stroke or peripheral nerve injury."

http://www.mondofacto.com/facts/dictionary?RSD.

[34]Complex regional pain syndrome (CRPS) is a chronic pain condition that can affect any area of the body, but often affects an arm or a leg. Doctors aren't sure what causes CRPS. In some cases, the sympathetic nervous system plays an important role in the pain. Another theory is that CRPS is caused by a triggering of the immune response, which leads to the inflammatory symptoms of redness, warmth, and swelling in the affected area.

http://www.nlm.nih.gov/medlineplus/ency/article/007184.htm.

marginally helpful, but also because of the potential for adverse impact on her return to her career.

Whipple's final argument is a question:

If you were me what would you do and would you really want to leave a well-established career with significant financial rewards for the life of a chronic pain patient and to receive disability benefits at an estimated 1/6 of my previous net income? I spent about 15 years in higher education and numerous personal sacrifices to get to where I was.

**Treating Providers.**

Dr. Schaeffer and Dr. Nesbit are Whipple's primary treating physicians.[35]

<u>Dr. Schaeffer, Family Medicine.</u>

On December 11, 2009, Whipple was seen at an office visit by Dr. Schaeffer.[36] The purpose of the consultation was to establish care. Whipple's complaints were pelvic pain, sweating, easy bleeding, and skin rash.[37] Subjective observations were "a very extensive history of the last couple of years of pelvic pain with bleeding."[38] In September, 2006, Whipple had a C-section and in December of that year an abdominal hysterectomy without oophorectomy[39] with CIN 3 disease.[40] There was no residual disease left. On December 24, 2006, Whipple admitted to the hospital with

---

[35]Doc. 66-1, p. 391.

[36]Doc. 66-1, p. 408.

[37]Doc. 66-1, p. 408.

[38]Doc. 66-1, p. 408.

[39]Doc. 66-1, p. 408.  Oophorectomy: The removal of one or both ovaries by surgery. http://www.medterms.com/script/main/art.asp?articlekey=4643.

[40]Cervical intraepithelial neoplasia: The growth of abnormal precancerous cells on the surface of the cervix. Grades from one to three (least to most) may be used to describe the degree of involvement.  http://www.medterms.com/script/main/art.asp?articlekey=2682.

sudden onset of abdominal pain. She was found to have a mildly dilated common bile duct.[41] On December 31, 2006, Whipple developed vaginal bleeding, was taken to the operating room and some sutures were placed which improved the condition. In January, 2007, Whipple had gradually worsening abdominal pain. She had a pelvic hematoma which was irrigated and removed. She was fairly stable until the spring of 2009 when she developed generalized abdominal pain. Various treatments were tried without significant success. Whipple consulted Dr. Nesbit at a pain management clinic. In July, 2009, Whipple consulted Dr. Beshara who tried some birth control medication, but matters worsened. Whipple returned to Dr. Nesbit in November, 2009, and he gave her Cymbalta. Whipple came to the emergency room on November 28, 2009, with significant increase in pelvic pain. She was found to have a left ovarian cyst, consistent either with resolution or rupture. The pain improved with narcotic therapy. On November 30, 2009, Whipple was at work as an anesthesiologist when she experienced a significant increase in pain. Doctors Julie Raymond and Rochelle Christiansen performed exploratory laparoscopy and found a hemorrhagic cyst with no evidence for endometriosis. Drs. Raymond and Christiansen performed a left oophorectomy and appendectomy. Dr. Schaeffer established an eleven item plan which included various tests, among other matters. Whipple was to return to Dr. Schaeffer after the test results.[42]

On January 11, 2010, Whipple again consulted Dr. Schaeffer. The purpose was to follow up on her complaint of abdominal pain. The laboratory results were all normal. Dr. Schaeffer's assessment was "pelvic pain likely becoming chronic pelvic pain and nocturia, question interstitial cystitis." Her plan was for Whipple to follow up with Dr. Stelzle (allergist) next week regarding

---

[41]Doc. 66-1, p. 408.

[42]Doc. 66-1, pp. 408-411.

recurrent episodes of angioedema; to follow up with Dr. Christiansen (urologist) on January 20 for

possible interstitial cystitis; to follow up with Dr. Nesbit regarding chronic pain; and to follow up with

Dr. Schaeffer as needed.[43]

On February 8, 2010, Whipple again followed up with Dr. Schaeffer about abdominal pain

and "disability paperwork." Subjectively, Dr. Schaeffer found that Whipple had consulted with Dr.

Nesbit who adjusted her oral analgesics. Whipple had seen Dr. Gary Christiansen who felt Whipple

had nocturnal polyuria and overactive bladder syndrome. He prescribed VESIcare[44] which seemed

to help. Dr. Christiansen does not think Whipple has interstitial cystitis. Dr. Schaeffer subjectively

also reports that Whipple had seen Dr. Stelzle who thinks Whipple has estrogen induced angioedema.

Dr. Christiansen thinks Whipple's rash is chronic urticaria.[45] Dr. Schaeffer subjectively reports

Whipple was last able to work on January 25, 2010. Dr. Schaeffer explained:

> Because of her significant pain and inability to sit or stand for prolonged periods of
> time, she has not been able to work as an anesthesiologist. She brings disability
> paperwork with her today. She has been instructed by Dr. Nesbit to avoid pushing,
> pulling, lifting. She does not feel that she is able to think clearly secondary to the
> severity of her pain. Given that she is an anesthesiologist this obviously presents
> concerns with her safety and caring for patient's in the OR at this time. She has been
> on a variety of medications. She continues to follow up with the Pain Management
> Clinic. She also is doing biofeedback, yoga, acupressure and pool therapy. She has
> not yet completed family medical leave paperwork.[46]

Dr. Jamie Schaeffer described the symptoms as "chronic pain >6mos, abdominal/pelvic location,

described as deep, burning in nature, present most of the time, radiating to groin, thighs, low back and

---

[43]Doc. 66-1, p. 412.

[44]A trademark for solifenacin. Solifenacin succinate: Antagonizes muscarinic receptors,
reducing urinary bladder smooth-muscle contractions.
    http://medical-dictionary.thefreedictionary.com/VESIcare.

[45]Doc. 66-1, p. 413.

[46]Doc. 66-1, p. 413.

sometimes thoracolumber area, worsened by and limiting ability to walk, sit, stand, lift, precipitated by even light exertion, some relief with narcotic pain medications and heat application. Dizziness nausea, and sweating during acute exacerbations."[47] Dr. Schaeffer also noted insomnia, edema and rash over the last several months.[48] Objectively she noted normal CT scan; no further work up necessary after gastroenterology consult; lab studies ruled out infectious etiology; urology consult ruled out interstitial cystitis; OB/GYN consult raised question of endometriosis; allergy/immunologist consult noted abdominal rash; and ultrasound report confirming ovarian cyst and operative reports.[49] Dr. Schaeffer noted consistent and progressive patient reports of severe pain requiring narcotic pain medications and treatment at Pain Management Clinic.[50] Dr. Schaeffer's staff observed Whipple to be in pain and having difficulty ambulating.[51] In Dr. Schaeffer's Treatment section of her report she observed that Whipple's "condition has not improved since surgical intervention."[52] Dr. Schaeffer encouraged Whipple to continue other therapies such as biofeedback, yoga, acupressure, and pool therapy.[53] Dr. Schaeffer concluded Whipple "should avoid exacerbating factors and should limit activities at work based on her level of pain and ability to safely carry out job duties. It is noted that

---

[47]Doc. 66-1, p. 363 and pp. 413-414.

[48]Doc. 66-1, p. 363.

[49]Doc. 66-1, p. 363.

[50]Doc. 66-1, p. 364.

[51]Doc. 66-1, p. 364.

[52]Doc. 66-1, p. 364.

[53]Doc. 66-1, p. 364.

she is unable to strain, sit, stand, or walk for extended periods of time and has cognitive limitations related to severity of pain."[54]

On February 8, 2010, Dr. Schaeffer's assessment included "disability secondary to #1," i.e. secondary to "chronic pelvic pain."[55]  Dr. Schaeffer's plan included "follow up with me in 1 to 2 months to reevaluate multiple symptoms."[56]

On April 8, 2010, Whipple followed up with Dr. Schaeffer.[57]  In the subjective section of her report Dr. Schaeffer refers to a "history of chronic abdominal pain."[58]  Whipple continues to work with the pain clinic, she has tried acupressure at home but has not tried acupuncture, she continues with physical therapy, she has cut back on narcotics because she felt herself becoming tolerant to them, and she had a pelvic ultrasound which showed a small luteal cyst.[59]  Objectively Dr. Schaeffer described Whipple as an "alert female in discomfort on the exam table" who repositions herself frequently and sat on a pillow.[60]  Her abdomen was soft and mildly tender.[61]  Dr. Schaeffer's assessment was chronic abdominal pain, exacerbation of her pelvic pain with luteal cyst, and

---

[54]Doc. 66-1, p. 364.

[55]Doc. 66-1, p. 413.

[56]Doc. 66-1, p. 414.

[57]Doc. 66-2, pp. 492-493.

[58]Doc. 66-2, p. 492.

[59]Doc. 66-2, p. 492.

[60]Doc. 66-2, p. 492.

[61]Doc. 66-2, p. 492.

insomnia.[62]  Dr. Schaeffer planned a followup in two to three months.  In the interim she suggested Whipple could try acupuncture and she should continue with the pain clinic and physical therapy.[63]

### Dr. Beshara, OB/GYN.

On March 26, 2010, a transvaginal ultrasound was performed pursuant to Dr. Marcia Beshara's recommendation.  Small follicle cysts are noted.  None of Dr. Beshara's own medical records were located in the administrative record.

### Dr. Nesbit, Pain Management.

On Nov 23, 2009, Whipple consulted Dr. Troy Nesbit.  He noted tenderness to palpation in the bilateral inquinal area.  His assessment was neuritis in the abdomen.

On December 31, 2009, Whipple returned to Dr. Nesbit.  He adjusted her medication because she was having trouble tolerating Cymbalta.  Dr. Nesbit's assessment was myofascial pain, muscle spasm and pubic neuritis.

On January 29, 2010, Whipple consulted with Dr. Nesbit with her chief complaint being abdominal/pelvic pain.[64]  Dr. Nesbit prescribed Opana IR, Opana ER and Flexeril.

On March 5, 2010, Whipple returned to Dr. Nesbit.  He assessed neuritis in the abdomen and pelvic pain.

### Dr. Gary Christiansen, Urology.

On January 10, 2010, Whipple consulted with Dr. Gary Christiansen with complaints of frequent urination during the night.  He prescribed VESIcare.

---

[62]Doc. 66-2, p. 493.

[63]Doc. 66-2, p. 493.

[64]Doc. 66-1, p. 418.

On January 20, 2010, Whipple consulted Dr. Gary Christiansen for a urology exam.[65]  His impression was "overactive bladder type symptoms."  He was uncertain about the relationship to her pelvic pain.[66]

Dr. Julie Raymond, Surgeon.

On November 30, 2009, Dr. Raymond was co-surgeon with Dr. Rochelle Christensen who performed "l. left salpingo-oophorectomy; 2. Lysis of adhesions; and 3. Incidental appendectomy." on Whipple.[67]  The post operative diagnosis was "1. Hemorrhagic left ovarian cyst; 2. Possible endometriosis; and 3. Omental adhesions."[68]  The pathology report diagnosis was (1) "features compatible with benign peritubal" cyst without features of endometriosis and without malignancy of the right ovary; (2) benign hemorrhagic luteal cyst and follicular cysts without malignancy of the left ovary and fallopian tube; and (3) fibrous obliteration of the distal lumen without acute inflammation and without malignancy of the appendix."[69]

On December 10, 2009, at Whipple's follow up consultation, Dr. Raymond observed "a strange irritation around all of her trocar sites . . . ."[70]  She was given an oxycodone prescription.[71]

---

[65]Doc. 66-2, pp. 454-455.

[66]Doc. 66-1, p. 454.

[67]Doc. 66-1, p. 366.

[68]Doc. 66-1, p. 366.

[69]Doc. 66-1, p. 368.

[70]Doc. 66-2, p. 470.

[71]Doc. 66-2, p. 470.

<u>Dr. Rochelle Christensen, OB/GYN.</u>

On January 12, 2010, Dr. Christenson saw Whipple.[72]  Her assessment was chronic pelvic

pain, endometriosis, and "history of adenocarcinoma in situ"[73], and "the differential diagnosis is still

quite large."[74]  Whipple was given a prescription for Micronor and expected back for a follow up in

two or three months or sooner if problems.[75]

<u>Regional Rehab Institute.</u>

On March 26, 2010, Whipple visited the Regional Rehab Institute.[76]  Therapist Marianne

Drobny recorded Whipple's medical diagnosis as "Abdominal/pelvic pain" and her treatment

diagnosis as "Myofacial pain into lower abdominal and pelvic area."[77]  Whipple was rating her pain

as 9 on a scale of 0 to 10.[78]  Therapist Drobny observed "a significant number of muscular trigger

points in the lower abdominal area, bilateral hip musculature, abductors and gluteals."[79]  One of the

four goals was to "return to work at either part time and (sic) full time status" at the end of eight

weeks.[80]

---

[72]Doc. 66-2, p. 475.

[73]A noninvasive abnormal proliferation of glands believed to precede the appearance of invasive adenocarcinoma; reported in the endometrium, large intestine, cervix, and other sites. http://www.mondofacto.com/facts/dictionary?query=adenocarcinoma+in+situ+&action=look+it+up.

[74]Doc. 66-2, p. 475.

[75]Doc. 66-2, pp. 475-476.  Micronor is "trademark for an oral contraceptive containing a progestin (norethindrone)."  http://medical-dictionary.thefreedictionary.com/Micronor.

[76]Doc. 66-2, p. 479.

[77]Doc. 66-2, p. 479.

[78]Doc. 66-2, p. 480.

[79]Doc. 66-2, p. 481.

[80]Doc. 66-2, p. 482.

## MEDICAL OPINIONS

**Dr. Schaeffer.**

Dr. Schaeffer noted Whipple is unable to strain, sit, stand or walk for extended periods of time and has cognitive limits related to severity of pain. Dr. Schaeffer instructed Whipple to avoid exacerbating factors and to limit activities at work based on her level of pain and ability to safely carry out job duties. Dr. Schaeffer adhered to the opinion "I do not feel she is ready to [return to work]. Uncertain when she will be ready to [return to work]."

**Whipple's other treating physicians.**

Whipple's urologist, OB/GYN, allergist, and pain specialist either did not express an opinion about Whipple's ability to work or expressed the opinion there was nothing about their examination which would limit Whipple from working.

**Unum's consultants.[81]**

All of Unum's consultants expressed the opinion that there were no objective medical findings to explain Whipple's complaints of pain and that her complaints of pain exceeded the medical findings.

<u>P. M., Sr. Clinical Consultant, R.N. MSCJ.[82]</u>

Consultant P.M. was asked to respond to the question "do the current medical records contained in the claim file support the R & L's as opined by Dr. Schaeffer?" On April 20, 2010, P.M. concluded "the records do not reveal a verifiable etiology for [Whipple's] complaints, based upon

---

[81]Unum's consultants have not been identified by name in the publicly available administrative record or in the briefs. Rather, they have been identified by initials and by specialty pursuant to the terms of the Protective Order, Doc. 62.

[82]Doc. 66-2, p. 517. The name of the person is redacted. *See* Doc. 80-1, p. 849 for full name.

diagnostic testing and physical exam findings, and the [restrictions] and [limitations] opined by Dr. Schaeffer are not medically supported."[83]

P.M. summarized the medical records.  Records from Regional Health Pain Management revealed Whipple had treated for chronic abdominal and pelvic pain, and also had low back and buttock pain.  She was treated with injections and medications.  She was seen on November 23, 2009; December 31, 2009; January 29, 2010; and March 5, 2010.[84]

Records from Dr. Christiansen, Urology, revealed " history of multiple pelvic surgeries over the last few years and has developed chronic pelvic pain."[85]  She was seen on January 20, 2010, for urinary urgency.  The physical exam revealed "some mild suprapubic tenderness consistent with overactive bladder type symptoms."[86]  She did not meet the criteria for interstitial cystitis.[87]

Records from Regional Rehab Institute reveal myofascial pain into the lower abdominal and pelvic area.  Whipple was evaluated on March 26, 2010, and will be "seen 1-2 times per week for 6-8

---

[83]Doc. 66-2, p. 517.  (Whipple's name replaces reference to the claimant and "restrictions and limitations" replaces reference to "R's and L's" in original).

[84]Doc. 66-2, p. 515.

[85]Doc. 66-2, p. 515.

[86]Doc. 66-2, p. 515.

[87]Interstitial cystitis is "a condition of the bladder occurring predominantly in women, with an inflammatory lesion, usually in the vertex, and involving the entire thickness of the wall, appearing as a small patch of brownish red mucosa, surrounded by a network of radiating vessels. The lesions, known as Fenwick-Hunner or Hunner ulcers, may heal superficially, and are notoriously difficult to detect. Typically, there is urinary frequency and pain on bladder filling and at the end of micturition. It is also called chronic interstitial cystitis. (Dorland, 27th ed)."
http://www.medicaldictionaryweb.com/Cystitis,+Interstitial-definition/.

weeks."[88]  Absent from P.M.'s summary is reference to the therapist Drobny's trigger point findings on March 26, 2010.

Records from Dr. Raymond, surgeon, revealed diagnoses of abdominal and pelvic pain.[89]  Dr. Raymond and Dr. Rochelle Christensen operated together on Whipple.  Dr. Raymond performed an appendectomy and adhesiolysis;[90] and Dr. Rochelle Christensen performed a left salpingo-oophorectomy.[91]  Postoperatively the diagnoses were "hemorrhagic left ovarian cyst, possible endometriosis and omental adhesions."[92]  Whipple was seen on January 12, 2010.  The record revealed complaints of increasing pain and urinary frequency and urgency.

Records from Rapid City Regional Health revealed Whipple was seen in the emergency room on November 28, 2009, for an exacerbation of her abdomen and pelvic pain.[93]

---

[88]Doc. 66-2, pp. 515-516.

[89]Doc. 66-2, p. 516.

[90]"Lysis" is the breakdown or destruction of cells. Lysis may be caused by chemical or physical damage, such as by drugs or injury, or infection. http://aidsinfo.nih.gov/education-materials/glossary/a-z/l

The surgical lysis of adhesions, usually by laparoscopy.  McGraw-Hill Concise Dictionary of Modern Medicine. © 2002 by The McGraw-Hill Companies, Inc. http://medical-dictionary.thefreedictionary.com/adhesiolysis.

[91]"Salpingo" is a combining form or prefix meaning relating to a tube (usually the Fallopian or eustachian tubes).  Compare: tubo-.  Origin: G. Salpinx, trumpet (tube).  (05 Mar 2000) http://www.mondofacto.com/facts/dictionary?query=salpingo&action=look+it+up

[92]"Omentum" is "a free fold of the peritoneum, or one serving to connect viscera, support blood vessels, etc.; an epiploon.  The great, or gastrocolic, omentum forms, in most mammals, a great sac, which is attached to the stomach and transverse colon, is loaded with fat, and covers more or less of the intestines; the caul. The lesser, or gastrohepatic, omentum connects the stomach and liver and contains the hepatic vessels. The gastrosplenic omentum, or ligament, connects the stomach and spleen.  http://www.mondofacto.com/facts/dictionary?query=omentum&action=look+it+up.

[93]Doc. 66-2, p. 516.

Consultant P.M. reported that Whipple "went out of work on November 30, 2009, due to increasing abdominal pain that had occurred since Jan. 2009."[94]  She returned to work full duty on December 21, 2009.  She ceased working January 25, 2010, "due to the complaints of worsening abdomen and pelvic pain."[95]

<u>Consultant T.S., DO, Family Medicine Certified.</u>[96]

Consultant T.S. was asked to respond to the question "do the current medical records contained in the claim file support the R & L's as opined by Dr. Schaeffer?"[97]  On May 3, 2010, Consultant T. S. answered "no" to the question posed, but said "reasonable support for time away from work is documented in the medical records up to 4/8/10."[98]

The analysis by Consultant T.S. is that no definitive etiology for Whipple's pain has been found or opined by the multiple specialists who have evaluated Whipple.[99]  Dr. Schaeffer is the only treating physician "opining work restrictions."[100]  The diagnostic tests do not support any specific diagnosis except minor ovarian cysts.  There is no medical data to support difficulty concentrating or memory deficits.  Consultant T.S. observed an inconsistency between Whipple's using a pillow and shifting body position on the exam table and objective findings on exam of only mild abdominal

---

[94]Doc. 66-2, p. 516.

[95]Doc. 66-2, p. 516.

[96]Doc. 66-2, p. 530.  The name of the person is redacted.  *See* Doc. 80-1, p. 882 for full name.

[97]Doc. 66-2, p. 523.

[98]Doc. 66-2, p. 530.

[99]Doc. 66-2, p. 530.

[100]Doc. 66-2, p. 530.

tenderness. Hence, Consultant T.S. concludes "as of 4/8/10 office note and exam with Dr. Schaeffer, no specific work restrictions are supported."[101]

On May 13, 2010, Consultant T.S. noted in the claims file that Dr. Schaeffer responded in writing to telephone calls and a letter. "He [Dr. Schaeffer] did not agree with my [Consultant T.S.] medical conclusion."[102]

### Consultant B.S., M.D.

On May 13, 2010, Consultant B.S. concluded there is no certain diagnosis; there was cognitive ability to work from December 21, 2009 to January 25, 2010; there is not "a subsequent decline that would preclude work at this time [which] is supported by clinical information."[103] ". . . [C]urrent file information does not reasonably support a condition that would preclude work."[104] "File information reasonably supports that the claimant's showing adequate cognitive capacity to work 12/21/09 to 1/25/10 supports adequate cognitive capacity to work at this time."[105]

### UNUM'S DECISION

**Administrative Procedural History.**

By letter dated May 4, 2010, Consultant T.S. asked Dr. Schaeffer to list supporting medical data if Dr. Schaeffer continues to be of the opinion that Whipple is restricted from work.[106]  Dr. Schaeffer replied "patient continues to have significant daily pain which prevents her from physically

---

[101]Doc. 66-2, p. 530.

[102]Doc. 66-2, p. 547.

[103]Doc. 66-2, p. 557. The name of the person is redacted. *See* Doc. 80-1, p. 904 for full name.

[104]Doc. 66-2, p. 557.

[105]Doc. 66-2, p. 557.

[106]Doc. 66-2, pp. 538-540.

(comfortably) being able to care for patients.  Narcotics caused mental fogginess, so were not safe to use while practicing medicine.  I do not feel she is ready to [return to work].  Uncertain when she will be ready to [return to work]."[107]  Dr. Schaeffer's response was in Unum's possession by 3:40 pm on May 7— the same day Unum approved Whipple's request for Long Term Benefits.

By letter dated May 7, 2010, Unum told Whipple "that we have approved your request for Long Term Disability benefits."[108]  Her first payment was $6,464.50.  "All future benefit payments will continue to be sent via electronic fund transfer to your financial institution unless you ask us to do otherwise."[109]  "Your date of disability has been determined to be November 30, 2009. . . .  Your benefits begin on April 04, 2010."[110]  "We have initially supported your work restrictions until your office visit with Dr. Schaeffer on April 8, 2010. . . . [O]ur in-house physician has contacted Dr. Schaeffer. . . .  Your benefits will continue as long as you meet the definition of disability in the policy. . . ."[111]

On May 10, 2010, Unum's claims agent called Whipple to say that Unum "had initially approved claim but that our physician contacted Dr. Schaeffer to get a better understanding of what basis there is for [restrictions/limitations] since there is still no etiology for her pain etc."[112]  Whipple told the Unum agent that medications made her foggy.  Whipple also told the agent she was willing to submit to psychiatric testing as Unum had suggested to Dr. Schaeffer's office.  Unum's agent

---

[107]Doc. 66-2, p. 539.

[108]Doc. 66-2, p. 534.

[109]Doc. 66-2, p. 534.

[110]Doc. 66-2, p. 535.

[111]Doc. 66-2, p. 535.

[112]Doc. 66-2, p. 544.

corrected Whipple, saying Unum is not asking for psychiatric testing and she did not know where that information came from.[113] "Unum did not have concerns about cognitive issues . . . ."[114]

On May 14, 2010, Meg Murray, Director, noted her agreement with Unum claims agent Kim Frassrand.[115] Murray observes the consultant reviews have been completed. As of the office visit of April 8, 2010, "no specific work restrictions are supported."[116]

By letter dated May 17, 2010, Unum denied Long Term Disability benefits to Whipple.[117] Unum advised Whipple her benefits are not approved beyond May 17 and that her last check will be released on May 17. Unum referred to the opinion of Whipple's treating physician Dr. Amy (sic) Schaeffer who said on February 8, 2010, that "you were to avoid exacerbating factors and should limit your activities at work based on your level of pain and ability to safely carry out job duties. Dr. Schaeffer indicated that you were unable to strain, sit, stand, or walk for extended periods of time and had cognitive limitations related to the severity of your pain."[118] Unum's in-house physician reviewed Whipple's file and the in-house physician said Whipple's claim was supported through April 8, 2010, so Unum "initially approved with support through your office visit with Dr. Schaeffer on April 8, 2010."[119] Unum said "there was no clinical support for the level of pain, cognitive deficits or

---

[113]Doc. 66-2, p. 544.

[114]Doc. 66-2, p. 552.

[115]Doc. 66-2, p. 560.

[116]Doc. 66-2, p. 560.

[117]Doc. 66-2, pp. 561-565.

[118]Doc. 66-2, p. 562.

[119]Doc. 66-2, p. 562.

26

functional deficits."[120]  The only specific diagnosis is minor ovarian cysts.  "Your exams document only mild abdominal tenderness which is not consistent with your complaints."[121]  "You . . . weaned yourself off of several medications and discontinued others that were causing side effects."[122]  Unum's physician contacted Dr. Schaeffer to inquire further about Whipple's condition.  Dr. Schaeffer responded on May 7, 2010, "indicating that you continue to have significant daily pain which prevents you from physically being able to care for patients and that your narcotics cause mental fogginess."[123]  "Dr. Schaeffer was not able to provide a diagnosis or etiology for your pain."[124]

Unum referred Whipple's file to a second in-house physician.[125]  Unum observed that while Whipple and her physician said she suffered cognitive side effects from medication, she continued to work with adequate cognitive capacity while on medications from December 21, 2009 to January 25, 2010.[126]  Whipple is now on fewer medications and no cognitive defects have been documented.[127]  The second in-house physician concluded that medical information in the file "does not support a current abdominal, pelvic, urological, or gynecological diagnosis that would preclude you from working."[128]

---

[120]Doc. 66-2, p. 562.

[121]Doc. 66-2, p. 562.

[122]Doc. 66-2, p. 562.

[123]Doc. 66-2, p. 562.

[124]Doc. 66-2, p. 562.

[125]Doc. 66-2, p. 562.

[126]Doc. 66-2, pp. 562-563.

[127]Doc. 66-2, p. 563.

[128]Doc. 66-2, p. 563.

**Unum's Denial.**

"Based on our review, the information in your claim file indicates you are not disabled as defined by your policy and are able to perform the duties of your own occupation. Your claim has been closed effective May 18, 2010."[129]

**Appeal.**

<u>Whipple's Appeal Letter</u>.

On May 25, 2010, Whipple appealed Unum's decision to deny her disability claim.[130] Whipple argues:

> . . . . your statement regarding no clinical support for the level of pain is unquestionably discriminatory against sufferers of chronic pain syndromes. One cannot document by radiological or laboratory, or other clinical data the extent of one's discomfort. The mere fact that I have seen several specialists for my condition supports rather than disclaims my disability. I am unable to identify any part of my policy stating an exclusion for pain syndromes.[131]

Whipple also argues the lack of reproducible pain supports a primary pathway of spinal cord or central origin rather than supporting a non-existent condition as Unum suggests. The lack of reproducible pain also argues against a mostly myofascial component, according to Whipple. She further observes myofascial pain itself is by definition "palpable and reproducible pain."[132] "My pain has always been described as a constant, deep burning from even before I had surgical intervention."[133] Whipple observes that her pain specialist Dr. Nesbit on each visit has described her

---

[129]Doc. 66-2, p. 563.

[130]Doc. 66-2, p. 568.

[131]Doc. 66-2, p. 569.

[132]Doc. 66-2, p. 569.

[133]Doc. 66-2, p. 569.

primary diagnosis as a neuritis condition.   She reminds Unum that she is a Yale trained anesthesiologist who has many years of experience treating both acute and chronic pain:

> I also remain quite puzzled about how any physician could make his own diagnosis not congruent with my treating physicians after never having met or examined me in person. I have extensive personal experience with making treatment plans for patients before I meet them and then completely changing the plan after one on one interaction. I have not even been allowed to discuss my case with any of your physicians so find fault with the very basis of this process.  If your Pain Specialist still feels confident in his evaluation in light of the above discussion I would politely request an evaluation by a different physician.[134]

Whipple cites a Mayo Clinic study which reports that Chronic Pelvic Pain accounts for approximately 10% of referrals to Gynecologists and as many as 61% of women never receive a specific diagnosis.[135]  Whipple also posed the question: why would she be motivated to trade her high paying career for a life of chronic pain so she could receive about 1/6th of her compensation in disability benefits?

<u>Claims Representative Teresa Ward</u>.

On May 28, 2010, Unum reassigned Whipple's file.[136]  On June 1, 2010, Teresa Ward from Unum talked to Whipple on the phone.  Among other matters Whipple said "she has nothing demonstrable on exam," but is willing to undergo an independent medical exam.  Ward wrote in her note "we will refer to medical."[137]  On June 1, 2010, Ward summarized Whipple's condition, the reason for Unum's denial of Whipple's claim, and identified the issues to addressed during medical

---

[134]Doc. 66-2, pp. 569-570.

[135]Doc. 66-2, p. 570.

[136]Doc. 66-2, p. 573.

[137]Doc. 66-2, p. 574.

review on appeal.[138]  Whipple went out of work on November 30, 2009.  She returned to work on December 21 and worked until January 25, 2010.  Whipple said she stopped working after January 25 due to continued pain in her pelvis and abdomen with some radiation to her lower back.  Her treating physician Dr. Schaeffer's disabling diagnoses were "chronic pain, unspecified symptom associated with female genital organs, and other post operative pain."[139]  Whipple has no current plan to return to work and by April 15 was required by her group to tell them whether she would return to work by June 1, 2010.[140]  Ward noted that Unum had denied Whipple's claim because her condition is not severe enough to preclude her from working in her occupation.[141]  Ward posed four issues to be addressed by Unum's medical consultants:

1.  Does file documentation support "restrictions (what you should not do) on function or limitations (what you cannot do) on function for the period 5/17/10?  If so, for what duration and from what conditions?

2.  If there are no medical signs, has there been a medical diagnosis that would reasonably be expected to produce these symptoms?  If yes, what is it and was the diagnosis made in accord with accepted medical standards?

3.  Are the intensity, frequency and duration of the symptoms consistent with the clinical examination and diagnosis?

4.  Please provide a clinical basis for your conclusions.[142]

---

[138]Doc. 66-2, pp. 575-576.

[139]Doc. 66-2, p. 575.

[140]Doc. 66-2, p. 575.

[141]Doc. 66-2, p. 575.

[142]Doc. 66-2, p. 576.

Ann Marie Pidgeon, R.N.

On June 7, 2010, Ann Marie Pidgeon, RN, summarized the medical information in Unum's file about Whipple.[143]   She identified and reviewed records from Dr. Marcia J. Beshara, MD–OB/GYN; Dr. Michael Troy Nesbit, MD, Regional Pain Management Center; Julie Raymond, MD, Regional Medical Clinic/surgery; Dr. Jamie Schaeffer, Rapid City Medical Center; Dr. Gary Christensen, MD, Black Hills Urology; Dr. Rochelle Christensen, MD, Black Hills Obstetrics and Gynecology; and Marianne Drobny, PT, regional Rehabilitative Institute.[144]  In essence, she repeated the administrative summary which had been prepared by Ward and added her own summary of the medical records to ready referral of Whipple's appeal to medical consultants.

Consultant B.S., M.D., Internal Medicine.

On June 23, 2010, B.S. completed "Section 2" of Unum's "Referral and Response Form."[145] To address issue one from above, i.e. file documentation to support restriction and limitations, B.S. responded "there is no identifiable significant underlying organic process which would prohibit work activity at Dr. Whipple's previous level of activity."[146] To address issue two from above, i.e. medical diagnosis to produce these symptoms, B.S. responded "there has (sic) been no diagnostic or physical exam findings to support these various diagnoses."[147] To address issue three from above, i.e. reported symptoms consistent with examination or diagnostic finding, B.S. responded "Dr. Whipple's pain

---

[143]Doc. 66-2, pp. 579-585.

[144]Doc. 66-2, p. 582.

[145]Doc. 66-2, pp. 586-588.  See Doc. 80-1, pp. 915-920 for full opinion.

[146]Doc. 66-2, p. 587 (punctuation altered).

[147]Doc. 66-2, p. 587.

complaints and pain behavior are in excess of identifiable anatomic or physiological abnormalities."[148] B.S. also notes "other than self report of the Dr. Whipple's perceived ability" the medical records are inconsistent with total impairment.[149] Addressing the fourth issue from above, i.e. analysis, B.S. discounted Whipple's complaints of pain because evaluation of her disclosed no explanation for her complaints of pain, but suggested "the non-specific diffuse symptoms would be more consistent with IBS.[150]

Consultant B.S. also authored a report dated June 25, 2010, which appears substantially identical to the language contained in Unum's Section 2 above.[151]

A.K., MD, Physical Medicine and Rehabilitation.

On July 23, 2010, Whipple's file was reviewed by A.K., MD, Physical Medicine and Rehabilitation, Unum.[152] Consultant A.K. filed a ten page report which concluded Whipple's "report of the incapacitating pain appears excessive for her currently available clinical examination/diagnostic findings."[153]

A.K. noted that Whipple was seen by Dr. Beshara on January 9, 2007, for a "post op exam."[154] Whipple had a previous laparoscopy for a hematoma. Whipple complained of persistent right upper

_____

[148]Doc. 66-2, p. 587.

[149]Doc. 66-2, p. 588.

[150]Doc. 66-2, p. 588. IBS, irritable bowel syndrome: a medical condition in which you have stomach pains and pass solid waste from your body more or less often than is normal. http://www.onelook.com/?w=IBS&ls=a.

[151]Doc. 66-2, pp. 589-595.

[152]Doc. 66-2, pp. 608-609.

[153]Doc. 66-2, p. 606 of pp. 599-609.

[154]Doc. 66-2, p. 601,

quadrant pain of unknown etiology. On June 15, 2009, Whipple saw Dr. Beshara again reporting that she felt very emotional.[155] Dr. Beshara noted that Whipple "had a total abdominal hysterectomy in 2006 for a small focus of adenocarcinoma in situ.[156]

A.K. noted that Whipple was seen by Dr. Nesbit on November 23, 2009, for abdominal pain.[157] Whipple reported her pain had been present for six months. The intensity of her reported pain was "5-9/10."[158] Dr. Nesbit's impression included inguinal area neuritis.[159]

A.K. noted that Whipple was seen at Rapid City Regional Hospital emergency room on November 28, 2009, for pelvic pain that had been present for one week.[160] Her abdomen was not distended, was not tender, vaginal exam was normal, and there was bilateral adnexal tenderness.[161] Ultrasound revealed a left ovarian cyst.[162]

A.K. noted that Whipple underwent laparoscopic surgery by Dr. Raymond on November 30, 2009, to open and drain the left ovarian hemorrhagic cyst.[163] Because Dr. Christianson thought

---

[155]Doc. 66-2, p. 601.

[156]Doc. 66-2, p. 602. "Adenocarcinoma" is a malignant epithelial tumor with a glandular organization. http://www.medicaldictionaryweb.com/Adenocarcinoma-definition/.

[157]Doc. 66-2, p. 602.

[158]Doc. 66-2, p. 602.

[159]Doc. 66-2, p. 602.

[160]Doc. 66-2, p. 602.

[161]Doc. 66-2, p. 602. "Adnexa," a Latin word (in the plural) is used in medicine in reference to appendages. For example, in gynecology the adnexa are the appendages of the uterus, namely the ovaries, Fallopian tubes and ligaments that hold the uterus in place. http://www.mondofacto.com/facts/dictionary?adnexa.

[162]Doc. 66-2, p.602.

[163]Doc. 66-2, p. 602.

Whipple might have endometriosis of the left ovary, a left salpingo-oophorectomy was performed.[164] An incidental appendectomy was performed as well.

A.K. noted that Whipple was seen by Dr. Schaeffer on December 11, 2009 to establish care.[165] Whipple reported that she had a C-section in September, 2006; an abdominal hysterectomy without oophorectomy for carcinoma in the cervix in December, 2006; that surgery was complicated by intra-abdominal hemorrhage which required four units of blood; Whipple had ilioinguinal neuritis which resolved after a nerve block; on December 24, 2006, she had abdominal pain and was found to have a dilated common bile duct; in 2007 she had progressive pelvic, right upper quadrant pain caused by pelvic hematoma which was irrigated and removed; in the spring of 2009 Whipple had progressive worsening generalized abdominal pain; in July, 2009, the pain became worse and she reported "episodes of being shaky and nauseated when the pain become significant."[166]

A.K. noted Whipple was seen by Dr. Nesbit on December 31, 2009, reporting she was unable to tolerate certain medications.  Her abdomen was tender in the lower quadrants and there was tenderness over the buttocks.[167]

A.K. noted Whipple was seen by Dr. Schaeffer on January 11, 2010, for her abdominal pain. Her abdomen was soft and nontender.[168]

---

[164]Doc. 66-2, p. 602.

[165]Doc. 66-2, p. 602.

[166]Doc. 66-2, pp. 602-603.

[167]Doc. 66-2, p. 603.

[168]Doc. 66-2, p. 603.

A.K. noted Whipple was seen by Dr. Rochelle Christiansen on January 12, 2010, for her abdominal pain.[169] The exam revealed tenderness in the superior left labia minora, mild bladder tenderness, and some right lower quadrant tenderness.[170]

A.K. noted Whipple was seen by Dr. Gary Christiansen on January 20, 2010, for evaluation of interstitial cystitis.[171] Dr. Christiansen did not believe Whipple met the criteria for interstitial cystitis. She had mild supra pubic tenderness.

A.K. noted Whipple was seen by Dr. Nesbit on January 20, 2010.[172] Whipple rated her pain at "7-8/10."[173] On exam she was tender over the right groin.[174] Dr. Nesbit's impression was "abdominal/pelvic pain, source unknown."[175]

A.K. noted Whipple was seen by Dr. Schaeffer on February 8, 2010.[176] Dr. Schaeffer referenced Dr. Stelzle, allergist, who thought Whipple had chronic urticaria.[177] Whipple reported to Dr. Schaeffer "she was unable to think clearly due to the severity of her pain."[178]

---

[169]Doc. 66-2, p. 603.

[170]Doc. 66-2, p. 603.

[171]Doc. 66-2, p. 603.

[172]Doc. 66-2, p. 603.

[173]Doc. 66-2, p. 603.

[174]Doc. 66-2, p. 604.

[175]Doc. 66-2, p. 604.

[176]Doc. 66-2, p. 604.

[177]Doc. 66-2, p. 604. Urticaria, a vascular reaction of the skin characterized by erythema and wheal formation due to localized increase of vascular permeability. The causative mechanism may be allergy, infection, or stress. http://www.medicaldictionaryweb.com/Urticaria-definition/

[178]Doc. 66-2, p. 604.

A.K. noted Whipple was seen by Dr. Nesbit on March 5, 2010, "with continued abdominal/pelvic pain."[179] On exam Whipple was tender over the abdomen. "Diagnostic impression included neuritis abdomen/pelvic."[180]

A.K. noted Whipple had a transvaginal ultrasound on March 26, 2010, which identified small cysts in the right ovary consistent with follicle cysts, and probably ruptured corpus luteum cyst.[181]

A.K. noted Whipple attended physical therapy on March 26, 2010.[182]  Whipple "rated her abdominal/pelvic pain at 8/10."[183]  "Multiple trigger points were noted in the hip abductors, gluteus medius, and quadratus lumborum."[184]

A.K. noted Whipple was seen by Dr. Schaeffer on April 8, 2010, during which Whipple noted certain medications produced side effects she could not tolerate.[185]

A.K. noted in the "restrictions and limitations" section of the report that Dr. Schaeffer reported Whipple had pelvic pain; that she could occasionally sit, stand or walk; that she was not to push or pull; that she could continuously perform fine finger movements and hand or eye coordinated movements; and that she could frequently lift up to ten pounds.[186]

---

[179]Doc. 66-2, p. 604.

[180]Doc. 66-2, p. 604.

[181]Doc. 66-2, p. 604.

[182]Doc. 66-2, p. 604.

[183]Doc. 66-2, p. 604.

[184]Doc. 66-2, p. 604.

[185]Doc. 66-2, pp. 604-605.

[186]Doc. 66-2, p. 605.

In the "conclusions" section of the report A.K. suggested the records from Dr. Stelzle should be obtained and that there should be a follow up with Dr. Schaeffer to see if there has been any improvement with the pain with the use of Allesse.[187]  After speaking with the appeals specialist, A.K. answered a modified question by saying Whipple "has had multiple abdominal operations and has had a lysis of abdominal adhesions in November 2009.  Abdominal adhesions can be a source of abdominal pain.  Abdominal adhesions may occur after any intra-abdominal operation or abdominal hemorrhage. The claimant's allergist has opined the claimant may have estrogen-induced angioedema, which possibly could lead to abdominal pain.  Dr. Stelzle's records should be obtained to see what lab work supports his opinion."[188]  In A.K.'s opinion, Whipple's "report of the incapacitating pain appears excessive for her currently available clinical examination/diagnostic findings."[189]

A.K. notes in the "analysis" section of the report "[t]he file supports the claimant has complained of chronic abdominal pain."[190]  "The file supports the claimant has been diagnosed with myofascial pain syndrome."[191]  "The file does not support restrictions for cognitive impairment."[192] "A whole person analysis will be performed after obtaining Dr. Stelzle's records."[193]

---

[187]Doc. 66-2, p. 605.

[188]Doc. 66-2, p. 606.

[189]Doc. 66-2, p. 606.

[190]Doc. 66-2, p. 607.

[191]Doc. 66-2, p. 608.

[192]Doc. 66-2, p. 608.

[193]Doc. 66-2, p. 608.

On July 22, 2010, Whipple's counsel furnished Dr. Stelzle's records to Unum.[194] Dr. Stelzle's new patient form revealed the following per his visit with Whipple on January 21, 2010:[195] persisting abdominal, rash pain, episodes of angioedema, urticaria with dizziness, sweating, nausea, and diarrhea.[196]  Dr. Stelzle noted Whipple's surgical history to include events in 2002; three in December, 2006; two in 2007; and one in November, 2009.[197] The laboratory result from Whipple's blood sample was normal.[198]

A.K. reviewed Dr. Stelzle's records and supplemented his/her earlier report on August 2, 2010 by recommending "review by a gynecologist to determine restrictions."[199]

On August 3, 2010, A.K. talked on the telephone with Dr. Rochelle Christensen.[200]  A.K. asked Dr. Christensen about restrictions for Whipple and her response was "the note did not comment on any restrictions from a gynecologic perspective."[201]  A.K. then asked Dr. Christensen if she would have recommended restrictions for Whipple as of the end of January, 2010.  Dr. Christensen's

---

[194]Doc. 66-2, p. 611,

[195]Doc. 66-2, pp. 612-614; p. 613 re date of visit.

[196]Doc. 66-2, p. 612.

[197]Doc. 66-2, p. 614.

[198]Doc. 66-2, p. 627.

[199]Doc. 66-2, pp. 618-622; recommendation on p. 619; date on p. 622.

[200]Doc. 66-2, p. 623.  "Christensen" is spelled differently in different places in this opinion. The spelling used each time the name appears in this opinion is taken from the spelling at the respective place cited in the administrative record.

[201]Doc. 66-2, p. 623.

response was "her office note did not support any restrictions from a gynecologic perspective."[202]

A.K. noted in conclusion the next step would be to "[p]erform a whole person analysis with Dr. S."[203]

On August 5, 2010, A.K. noted in the file:

I met with Dr. Schnars on 8/5/10 and we reviewed the information on claimant Joy Whipple. File number 556-3260. We discussed the claimant's complaints. We also reviewed the newly acquired information from Dr. Stelzle. I reviewed that I spoke with Dr. Rochelle Christensen, the claimant's gynecologist who did not offer any restrictions as of the end of January 2010 for a gynecologic condition. Since the claimant's own gynecologist is not offering restrictions for a gynecologic condition, it is felt we do not have have (sic) to have the file reviewed by a gynecologist. The claimant's abdominal pain does not support any specific restrictions. The claimants (sic) myofascial pain syndrome would support allowing the claimant to change posture briefly (1-2 minutes) twice an hour. The file does not support restrictions for cognitive impairment. For a whole person perspective, additional restrictions are not supported.[204]

Unum's Decision On Appeal.

By letter dated August 10, 2010, Unum advised Whipple's lawyer, among other matters, "Long Term Payments have not been approved beyond May 17, 2010.[205] Dr. Whipple is no longer considered disabled "as defined by her policy."[206] "We have concluded Dr. Whipple is able to perform the duties of her occupation and she no longer meets the definition of disability."[207] The letter documents Dr. Whipple's medical history, noting that "persistent, severe abdominal pain is reported," but Unum's conclusion is "the non-specific diffuse symptoms would be more consistent

---

[202]Doc. 66-2, p. 623.

[203]Doc. 66-2, p. 623.

[204]Doc. 66-2, p. 625.

[205]Doc. 66-2, p. 626.

[206]Doc. 66-2, p. 627.

[207]Doc. 66-2, p. 627.

with IBS (irritable bowel syndrome)."[208]  "There is no identifiable significant underlying organic process which would prohibit work activity at Dr. Whipple's previous level of activity."[209]  "Dr. Whipple's pain complaints and pain behavior are in excess of identifiable anatomic or physiological abnormalities."[210]  "Other than the self report of Dr. Whipple's perceived ability, the medical records are inconsistent with total impairment."[211]  "Based on our review, the information in your client's claim file supports that she is able to perform the duties of her own occupation and the decision to deny benefits on her claim is appropriate."[212]

## DISCUSSION

**Standard.**

The standard of review is well established in the Eighth Circuit.  The Plan administrator's decision is reviewed for an abuse of discretion if the Plan reserves discretionary power to construe terms or make eligibility determinations.[213]  "We will reverse if the Plan administrator's decision was inconsistent with Plan goals, renders other terms meaningless, superfluous or internally inconsistent, conflicts with the substantive or procedural requirements of ERISA, is inconsistent with prior interpretations of the same words, or contrary to the Plan's clear language.  When, as here, a conflict

---

[208]Doc. 66-2, p. 627.

[209]Doc. 66-2, p. 628.

[210]Doc. 66-2, p. 628.

[211]Doc. 66-2, p. 628.

[212]Doc. 66-2, p. 631.

[213]*Carrow v. Standard Insurance Company*, 664 F.3d 1254, 1258 (8th Cir. 2012).

of interest exists because the Plan is both the decision-maker and the insurer, we take that conflict into account and give it some weight in the abuse of discretion calculation."[214]

The Plan administrator may rely on reports of consulting, non-examining physicians over the reports of treating physicians.[215] "A plan administrator abuses its discretion when it ignores relevant evidence."[216] "It is not unreasonable for a plan administrator to deny benefits based upon a lack of objective evidence."[217] "A plan administrator is not required to order an IME when the claimant's evidence is facially insufficient to support a finding of disability."[218]

"Review of an administrator's decision under an abuse of discretion standard, though deferential, is not tantamount to rubber-stamping the result. On the contrary, we review the decision for reasonableness, which requires that it be supported by substantial evidence that is assessed by its quantity and quality."[219] Five factors are considered: (1) whether the administrator's interpretation is consistent with the goals of the Plan; (2) whether the interpretation renders any language in the Plan meaningless or internally inconsistent; (3) whether the administrator's interpretation conflicts with the substantive or procedural requirements of the Plan; (4) whether the administrator has interpreted

---

[214]*Carrow* at 1258-1259 (internal citations omitted).

[215]*Carrow* at 1259.

[216]*Willcox v Liberty Life Assurance Company of Boston*, 552 F.3d 693, 701 (8th Cir. 2008).

[217]*Manning v. American Republic Ins. Co.*, 604 F.3d 1030, 1041 (8th Cir. 2010).

[218]*Manning* at 1041.

[219]*Torres v. Unum Life Insurance Company Of America,* 405 F.3d 670, 680 (8th Cir. 2005) (internal citations omitted).

the relevant terms consistently; and (5) whether the interpretation is contrary to the clear language of the Plan.[220]

The administrative record here is reviewed for abuse of discretion.

**Analysis.**

Policy Definition Of Disability.

You are disabled when Unum determines that:

you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury, and you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.[221]

Unum's policy also provides:

We may require you to be examined by a physician, other medical practitioner and/or vocational expert of our choice. . . .[222]

Unum's policy also provides:

Unum will not recognize you . . . as a physician for a claim that you send to us.[223]

Whipple's Job Description.

Whipple's job description:

1. Provide 24 hour call coverage at a Level II Trauma Center includes:
   a. Emergency anesthesiology services to critically ill patients
   b. Medical direction of CRNA team
   c. Coordination of OR coverage after normal business hours
2. Assume the role of anesthesiologist in charge (Carry the 850 Pager)
   a. Coordinates OR coverage during daytime hours
   b. Provide medical direction of CRNAs

---

[220]*Torres* at 680.

[221]Doc. 66-2, p. 322 and p. 535.  There is more to the definition, but this is the only part of the disability definition which is in play.

[222]Doc. 66-2, p. 322.

[223]Doc. 66-2, p. 344.

     c. Fulfills the role of back-up anesthesiologist

     d. Field inquiries for additional services including:

           i. Providing Labor Epidurals.

           il. Respond to emergency and consult requests from outside of the operating rooms

3. Provide medical direction to a team of CRNAs and SRNAs

     a.. Perform a pre-anesthesia exam and evaluation

     b. Prescribe the anesthesia plan

     c. Personally take part in the most demanding aspects of the anesthesia plan including induction and emergence

     d. Monitor the course of the anesthesia at intervals

     e. Be physically present and available for immediate diagnosis and treatment of emergencies

     f. Provide the post-anesthesia care indicated

4. Placement of arterial lines, central lines and Swan-Ganz catheters

5. Placement and rounding of labor epidurals and epidurals for acute pain services.[224]

### Distinction Between Impairment And Disability.

With the exception of the central fact issue, the facts are essentially undisputed. The disputed fact issue is pain. Whipple asserts the pain and pain induced associated circumstances limit her from performing the material and substantial duties of an anesthesiologist. Unum asserts Whipple's claims of pain are not supported, so that Whipple is not limited from performing the material and substantial of -an anesthesiologist.

The central issue is whether Whipple was limited from performing "the material and substantial duties of [her] regular occupation due to [her] sickness or injury." Unum tried to find an objective medical explanation for Whipple's claims of pain. When none could be found Unum decided her claim of pain was not supported and, therefore, she could, without limitation, perform the material and substantial duties required by her job. But what Unum needed to discover was whether Whipple was limited from performing the material and substantial duties of her job—a

_____

[224]Doc. 66-2, p. 484.

different matter from finding an explanation for her complaints of pain. To do that, Unum needed more than medical consultants reviewing Whipple's medical records. Unum needed a qualified person to review not only Whipple's medical records, but to review the material and substantial duties required of her by her job and to review whether she was limited in her performance of those duties.

There is a fundamental difference between assessing impairment and assessing disability.[225] A qualified physician assesses impairment. A qualified vocational person assesses disability. To illustrate, loss of a small portion of the little finger produces a small impairment rating which has no impact whatsoever on the capacity of a lawyer or judge or claims administrator to perform the material and substantial duties of his or her job.[226] The same small injury to the little finger of a concert pianist or a surgeon, however, could totally disable the concert pianist or surgeon from performing the essential duties of his or her job.

A medical professional could make an impairment evaluation, but the same medical training and experience does not qualify that medical person to make a disability evaluation. It takes different training and experience to make the disability evaluation. A physician can be qualified to make both an impairment rating and a disability determination, e.g. "an occupational medicine physician who understands the job requirements in a particular workplace can provide insights on how the

---

[225]There is a movement afoot to move away from the term "disability" in preference for the phrase "activity limitation." AMA Guides To The Evaluation Of Permanent Impairment, Fifth Edition, p. 8.

[226]The impairment rating could be 5% or less of the hand and 3% or less of the whole person. AMA Guides To The Evaluation Of Permanent Impairment, Fifth Edition, p. 440. See p. 9 for other examples.

impairment could contribute to a workplace disability."[227]  "An *impairment* evaluation, however, is only one aspect of *disability* determination."[228]

No person qualified by training or experience to evaluate whether Whipple was limited from performing the material and substantial duties of an anesthesiologist at West River Anesthesiology Consultants, PC did so.  That Unum was furnished Whipple's job description which might have been read by persons at Unum falls short of being an evaluation to determine whether she was limited from performing the material and substantial duties required of her at her job.

Unum's Review.

Each side spends much argument about the presence and absence of objective medical facts in the record to support Whipple's claims of pain.  Each side cites favorable Eighth Circuit Court of Appeals decisions from the abundant pool of applicable cases decided by the Eighth Circuit Court of Appeals— sometimes both sides cited the same case for opposite sides of the argument.

Unum had the case reviewed by five consultants.  Four were Unum employees and the fifth was a regular Unum consultant.  Whipple's primary physician, who clung to the opinion that Whipple was not ready to return to work, could not diagnose a medical condition to explain Whipple's pain.  Unum stopped considering Whipple's claims about being limited from performing the material and substantial duties of an anesthesiologist when Unum decided there was no objective medical support for Whipple's claims of disabling pain.  Unum applied the wrong standard to deny Whipple's claim.  Unum failed to evaluate whether Whipple was limited from performing the material and substantial duties of her own occupation.  Unum concluded that Whipple could work as an anesthesiologist

---

[227]AMA Guides To The Evaluation Of Permanent Impairment, Fifth Edition, p. 8.

[228]AMA Guides To The Evaluation Of Permanent Impairment, Fifth Edition, p. 8.

because an objective medical explanation for Whipple's pain could not be diagnosed and because Whipple worked full time from December 21, 2009, through January 25, 2010. As explained below, it was not reasonable for Unum to deny benefits without a vocational assessment from a person qualified by training and experience to determine whether Whipple was limited from performing the material and substantial duties of anesthesiologist. In this instance that was an abuse of discretion.

## RECOMMENDATION

**1.      Unum Should Have Conducted A Vocational Evaluation To Determine Whether Whipple Was Limited From Performing The Material And Substantial Duties Of An Anesthesiologist.**

Failure by the Plan administrator to obtain a vocational evaluation can render the Plan language meaningless or contrary to clear language of the Plan.[229]   Whipple's attending physician, Dr. Schaeffer told Unum Whipple "should limit activities at work based on her level of pain and ability to safely carry out job duties." Dr. Schaeffer told Unum Whipple is unable to strain, sit, stand or walk for extended periods of time and has cognitive limitations related to severity of pain."[230]   On April 28, 2010, Dr. Schaeffer told Unum "I do not feel she is ready to RTW (return to work). Uncertain when she will be ready to RTW."[231]  Dr. Schaeffer identified objective findings, i.e. ovarian cyst; surgical intervention; nocturnal polyuria; abdominal rash; consistent and progressive patient reports of severe pain requiring narcotic pain medications; actively seeking treatment at Pain Management Clinic; and staff observed difficulty with ambulating.[232]  Whipple offered herself for an independent medical examination. Dr. Schaeffer offered to refer for cognitive studies. Unum did not

---

[229]*Torres,* 405 F.3d 670 at 680.

[230]Doc. 66-1, p. 364.

[231]Doc. 66-2, p. 539.

[232]Doc. 66-1, pp. 363-364.

arrange an independent medical examination.  Unum did not believe a cognitive evaluation was necessary.  Unum did not conduct a vocational evaluation.

It is presumed Unum's two consultants who are physical and rehabilitation specialists are qualified by training and experience to perform vocational evaluations.  There is nothing in the record, however, that shows that these two consultants, or anyone else, performed an actual evaluation to determine whether Whipple was limited from performing the material and substantial duties of her regular occupation.  Unum conducted a medical records review as distinguished from a vocational analysis.  Though Whipple's failure to provide Unum with her own vocational evaluation renders her case different from that fact which existed in *Torres*, her circumstances are similar to *Torres*.  Her claimed limitation in performing the tasks described on her job description created significant liability issues for her and her medical group,[233] not to mention significant risk issues for her patients.  Even though Whipple did not provide Unum with a formal vocational analysis, as occurred in *Torres*, Whipple presented enough facts to put Unum on notice about Whipple's limitation from performing the material and substantial duties of her occupation.  Her job description required Whipple to perform, among other tasks, emergency anesthesiology services to critically ill patients; to provide labor epidurals; to respond to emergency and consult requests from outside of the operating rooms; personally take part in the most demanding aspects of the anesthesia plan including induction and emergence; monitor the course of the anesthesia at intervals; be physically present and available for immediate diagnosis and treatment of emergencies; placement of arterial lines, central lines and Swan-Ganz catheters; and placement of labor epidurals and epidurals for acute pain services. Whipple said she was limited from performing those duties.  She abandoned a job which paid $22,500

---

[233] As was specifically mentioned in *Torres,* 405 F.3d 670 at 681.

47

a month. She reported to Unum that medical directors and patients alike inquired of her about her well being. Other medical providers inquired of her how they could help her. She claimed she had trouble standing and walking for significant periods of time. Her job required her to be on the job sometimes twelve hours or more per day, standing or walking for significant periods of time. Her job description required her to carry a pager, i.e. to be on call. Her regular job duties included administering anesthesia, and doing so also in emergency situations. She opted not to return when her medical group gave a deadline. Her treating physician said Whipple was limited in performing her job. Her treating physician did not know when Whipple could be expected to return to work. Yet Unum conducted no evaluation to learn whether Whipple was limited from performing those duties. In *Torres* the Eighth Circuit Court of Appeals ruled it was an abuse of discretion for Unum not to perform a vocational evaluation. "Through its inaction, UNUM completely failed to comply with the Plan's requirement that UNUM consider Torres's ability to perform his occupation "'as it is normally performed in the national economy.'"[234]   The same is true in Whipple's case.

To be clear, the measure of whether to pay or not to pay disability benefits is:

Was Whipple limited from performing the material and substantial duties of her regular occupation?

This is the measure Unum erroneously did *not* use. Other than what Whipple and her doctor said, Unum does not know the answer to this question because Unum did not evaluate whether Whipple was limited from performing the material and substantial duties of her regular occupation.

The measure of whether to pay or not to pay disability benefits is NOT:

Was there clinical support for Whipple's complaints of pain?

---

[234]*Torres,* 405 F.3d 670 at 681.

This is the measure Unum erroneously used.   There was no diagnosis to explain Whipple's complaints of pain.   That there was no clinical support (objective medical findings) for her pain complaints, however, does not mean that there was no pain, that Whipple was faking or malingering, or that Whipple was not limited from performing the material and substantial duties of her regular occupation.   Nonetheless, Unum concluded the opposite, i.e., Unum concluded Whipple either was not experiencing significant pain or was faking or malingering, and ultimately concluded that she was not limited from performing the material and substantial duties of her regular occupation.

### 2.   Nothing About Whipple's Condition Changed Between The Time Unum First Awarded LTD Benefits To Whipple, But Then Later Denied Benefits.

When determining whether an insurer has properly terminated benefits that it initially undertook to pay, "it is important to focus on the events that occurred between the conclusion that benefits were owing and the decision to terminate them."[235]

By letter dated May 7, 2010, Unum agreed to pay Whipple's claim for LTD benefits.[236]   The date of disability was established as November 30, 2009, the date of Whipple's surgery.   After calculating the dates for the period of elimination under the terms of the policy, the date benefits began was April 4, 2010.   The amount of the benefit was $6,464.50 covering the period of April, 4, 2010 through May 3, 2010 and the check was to be electronically transferred on May 8, 2010.[237] Unum told Whipple in the May 7 letter "[w]e will make every effort to ensure that you receive future benefit checks on or before the 10th of the month."[238]   Unum also wrote in the same letter to Whipple

---

[235]*McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 590 (8th Cir. 2002).

[236]Doc. 70, p. 11, undisputed SOF 44.  Unum does not dispute this fact, Doc. 72, p. 3. Unum's May 7, 2010, letter can be found at Doc. 66-2, pp. 534-536.

[237]Doc. 66-2, p. 534.

[238]Doc. 66-2, p. 535.

"[y]our benefits will continue as long as you meet the definition of disability in the policy provided by your employer and are otherwise eligible under the policy terms."[239]  Unum then quoted in the same letter the policy definition of disability and its subparts referencing "[y]ou are disabled when Unum determines that: you are limited from performing the material and substantial duties of your regular occupation . . . " and the other words in the disability definition section which are not stated here.[240]

Unum told Whipple "[w]e have initially supported your work restrictions *until* your office visit with Dr. Schaeffer on ***April 8**, 2010.  At this time, our in-house physician has contacted Dr. Schaeffer to discuss your condition and work restrictions to evaluate your eligibility for ongoing disability payments."[241]  On May 4, 2010, three days before May 7, 2010, when Unum approved Whipple's claim for LTD benefits, Unum's in-house physician Dr. T.S., D.O., to whom Unum had paid $758,853.59[242] during 2007 through 2010, wrote to Dr. Schaeffer asking Dr. Schaeffer to answer four questions.[243]  Dr. Schaeffer responded by handwriting responses on Dr. T.S.'s letter, delivered to Unum by facsimile "I do not feel she is ready to RTW.  Uncertain when she will be ready to RTW."[244]  Dr. T. S. noted Dr. Schaeffer's responses to the May 4 questions and said "[t]his response to date from Dr. Schaeffer does not alter my 5/3/10 OSP Review conclusions."[245]

---

[239]Doc. 66-2, p. 535.

[240]Doc. 66-2, p. 535.

[241]Doc. 66-2, p. 535 (italics and bold added for emphasis).

[242]Doc. 70, p. 10, undisputed SOF 40.

[243]Doc. 66-2, pp. 538-540.

[244]Doc. 66-2, p. 539.

[245]Doc. 66-2, p. 548.

But despite the conclusions of Dr. T.S. on May 3, Unum on May 7 *accepted* Whipple's claim. Yet on May 14, 2010 and by letter dated May 17, 2010, after Dr. T.S. told Unum that his/her conclusions did not change after communication with Dr. Schaeffer, Unum then *denied* Whipple's claim.[246]  Nothing changed about Whipple's condition.  Nothing changed about Dr. Schaeffer's opinion about Whipple's ability to work.  Nothing changed about Unum's in-house physician's opinion.  Also, it was on March 26, 2010, that trigger point findings occurred, i.e. objective medical findings per *Johnson*— just before both April 4 the date when Unum said Whipple qualified for LTD benefits and April 8, 2010, the date when Unum said Whipple's benefits were no longer supported. Yet based on the very same information Unum both accepted and denied Whipple's claim, telling her first she will receive monthly benefits so long as she continues to meet the policy definition of disability—which she obviously did according to Unum's own decision to pay the LTD benefits— but then telling her ten days later that her LTD claim was denied.  In effect, based on the very same information, Unum told Whipple both that she *was limited* from performing the material and substantial duties of her regular occupation (when her claim was accepted for payment) and that she *was not limited* from performing the material and substantial duties of her regular occupation (when her claim was denied for further payments).

The policy definition of disability is the standard Unum should have used, but did not.  The policy definition of disability is the standard to apply to decide whether Whipple qualified for LTD benefits.  That standard is whether Whipple was limited from performing the material and substantial duties of an anesthesiologist.  What Unum did was to decide there were no objective medical findings

---

[246]Doc. 70, p. 13, undisputed SOF 52.

did to support Whipple's claims of pain, a different matter from deciding whether Whipple was limited from performing the material and substantial duties of an anesthesiologist.

### 3. Unum's Conclusion There Are No Objective Medical Findings To Support Whipple's Claims Of Pain Is Wrong.

Unum said Whipple's complaints about pain and inability to work were not supported by objective medical evidence. But the Eighth Circuit Court of Appeals has established that "trigger-point findings consistent with fibromyalgia constitute objective evidence of the disease."[247] While Whipple's condition is not fibromyalgia, the principle remains the same for Whipple's chronic pelvic pain. There were trigger point findings for Whipple on March 26, 2010, at the critical time of Unum's decisions.[248] In other words, there were objective medical findings, contrary to Unum's conclusion and stated reason for denial.

On palpation there were "significant trigger points" in the hip adductors; "slightly" noted trigger points of the Gluteus medius; "significant trigger points" of the left Quadratus lumborum and "moderate" trigger points on the right; "significant trigger points" bilaterally of the Illiac; "significant trigger points" of the Obliques, greater on the left than right; "moderate trigger points" of the external pelvic floor musculature (levator ani[249]); and "minimal trigger points" of the Gluteals. Also, it is not

---

[247]*Johnson v. Metropolitan Life Insurance Company*, 437 F.3d 809, 814 (8th Cir. 2006).

[248]Doc. 66-1, p.481.

[249]"Levitator ani" is one of a pair of muscles of the pelvic diaphragm that stretches across the bottom of the pelvic cavity like a hammock, supporting the pelvic organs. It is a broad thin muscle that separates into the pubococcygeus and the iliococcygeus. It originates from the ramus of the pubic bone, the spine of the ischium, and a band of fascia between the pubis and the ischium; it inserts into the last two segments of the coccyx, the anococcygeal raphe, the sphincter ani externus, and the central tendinous point of the perineum. The left and right levator ani muscles are divided ventrally but converge as a single sheet across the midline dorsally, forming most of the pelvic diaphragm. The levator ani is innervated by branches of the pudendal plexus, which contains fibers from the fourth sacral nerve. It functions to support and slightly raise the pelvic floor. The pubococcygeus draws the anus toward the pubis and constricts it.

clear whether it was a trigger point finding, but significant pain was noted on the suprapubic bone at the incision site of Whipple's C-section "as well as significant pain with light palpation."[250]

"A plan administrator abuses its discretion when it ignores relevant evidence."[251]  While a reviewing court may not "substitute its own weighing of the evidence for that of the administrator," the obligation of an ERISA fiduciary requires more than "combing the record for evidence in its favor and abandoning its review upon discovering more than a scintilla of such evidence."[252]  These objective, trigger point findings occurred on March 26, 2010.[253]  They were ignored by Unum.  These trigger point findings are relevant and they constitute more than a scintilla of evidence.  The trigger point findings are directly related to pain, are contrary to Unum's assertion that there "is no clinical support for the level of pain . . .,"[254] and occurred in the very midst of Unum's decision making time frame.  It was an abuse of discretion by Unum to ignore the trigger point findings as objective medical findings.[255]

### 4.    Unum's Conflict Of Interest Supplements An Already Tipped Scale.

*Carrow v. Standard Insurance Company*[256] directs that Unum's conflict of interest should be given some weight and *Wakkinnen* directs, after *Glenn,* a conflict of interest is one factor to consider,

---

http://medical-dictionary.thefreedictionary.com/levator+ani

[250]Doc. 66-2, p. 481.

[251]*Willcox v. Liberty Life Assurance Company Of Boston*, 552 F.3d 693, 701 (8th Cir. 2009).

[252]*Willcox* at 702 (internal quotation marks and citations omitted).

[253]Doc. 66-2, p. 482.

[254]Doc. 66-2, p. 562.

[255]*Willcox* at 701.

[256]*Carrow v. Standard Insurance Company*, 664 F. 3d 1254, 1258 (8th Cir. 2012).

and then perhaps only as a tie breaker.[257]  Because there is other adequate evidence on which to decide this case and because Unum's conflict of interest from being both administrator of the Plan and the payer of the Plan plays no identifiable role in its decision, Unum's conflict of interest has been considered, but Unum's conflict of interest is not pivotal to this decision.  Suffice it to say Whipple has produced evidence that Unum's medical consultants were paid substantial sums by Unum from 2007 through 2010[258] and that Unum has been previously criticized for biased claims handling.[259]  On the other hand it must be simultaneously noted that after the criticism of Unum occurred "[t]he result was a plan of corrective action implemented through a regulatory settlement agreement and consent orders entered into with the states."[260]

### Conclusion: Five Factor Analysis.

Unum told Whipple she could perform the material and substantial duties of her job without an opinion from a person qualified by training and experience to determine whether Whipple was limited from performing the material and substantial duties of an anesthesiologist.  Unum did so without any change in circumstance between the time of its conclusion benefits were owing and its decision to terminate benefits.   The only changed circumstance was Unum's decision itself.  Unum told Whipple there was no clinical support for her pain when in fact there were objective medical findings to support Whipple's claims of pain, i.e. trigger point findings.

---

[257]*Wakkinen v. Unum Life Ins. Co. of America,* 531 F.3d 575, 581-582 (8th Cir. 2008).

[258]Doc. 70, p. 9, SOF 35; p. 10, SOF 40; p. 12, SOF 50; and p. 15, SOF 59.

[259]*Chronister v. Unum Life Insurance Company Of America*, 563 F.3d 773, 776 (8th Cir. 2009) citing *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008).

[260]*Wakkinen* at 582.

"We will reverse if the Plan administrator's decision was inconsistent with Plan goals, renders other terms meaningless, superfluous or internally inconsistent, conflicts with the substantive or procedural requirements of ERISA, is inconsistent with prior interpretations of the same words, or contrary to the Plan's clear language. When, as here, a conflict of interest exists because the Plan is both the decision-maker and the insurer, we take that conflict into account and give it some weight in the abuse of discretion calculation."[261]  Unum's conduct was contrary to each of these five factors.

    Factor One:    Whether the administrator's interpretation is consistent with the goals of the Plan.

A goal of the plan necessarily includes interpreting the Plan to protect some part of an insured's income when the insured is limited from performing the material and substantial duties of her regular occupation.  Unum denied Whipple's claim without evaluating whether Whipple was limited from performing the material and substantial duties of her own occupation.  Denying a valid claim is not consistent with a goal of the plan to protect a disabled insured from total loss of income. On remand after a vocational assessment it might be in retrospect that Unum's decision was correct, but on the existing administrative record it is more likely that Whipple's claim is a valid claim.

    Factor Two:    Whether the interpretation renders any language in the Plan meaningless or internally inconsistent

Unum disregarded the Plan's definition of disability and substituted a different standard, i.e. whether there was clinical support Whipple's claims of pain.  Additionally, Unum concluded there were no objective medical findings when in fact there were, i.e. trigger point findings— during the very time when Unum concluded there were none.  Also, Whipple's pain complaints were corroborated by undisputed facts— her surgery, years long history of consistent complaints of pain

---

[261]*Carrow v. Standard Insurance Company*, 664 F. 3d 1254, 1259 (8th Cir. 2012).

and taking multiple prescription medications to address the pain complaints and in the absence of anyone suggesting that she was faking or malingering.  Disregarding the Plan definition of disability rendered meaningless the Plan definition of disability.  Unum did not evaluate whether Whipple's condition limited her from performing the material and substantial duties of her regular occupation.

> Factor Three:  Whether the administrator's interpretation conflicts with the substantive or procedural requirements of the Plan

A substantive requirement of the Plan is to decide whether a claimant is limited from performing the material and substantial duties of her job.  Unum decided that since there were no objective medical findings (contrary to the fact) to support Whipple's claims of pain she could perform without limitation emergency anesthesiology services to critically ill patients; assume the role of anesthesiologist in charge; prescribe the anesthesia plan; personally take part in the most demanding aspects of the anesthesia plan, including induction and emergence; monitor the course of the anesthesia at intervals; be physically present and available for immediate diagnosis and treatment of emergencies; placement of arterial lines, central lines and Swan-Ganz catheters; and placement and rounding of labor epidurals and epidurals for acute pain services.  No place in the administrative record or in Whipple's medical records does it appear that Whipple could perform those functions without limitation after January 25, 2010.  The only evidence in the administrative record about Whipple's capacity to perform the material and substantial duties of her occupation is that Whipple stopped working because of her pain; her doctor said Whipple should limit her work activities; and her doctor did not know when Whipple would be able to return to work.  But because a diagnosis could not be identified to explain Whipple's pain complaints and because Whipple worked full time from December 21 though January 25, Unum decided she was not limited from performing the material and substantial duties of her job.  But the absence of a diagnosis is a different matter from

being limited from performing the material and substantial duties of her job. The absence of a diagnosis does not necessarily mean Whipple was not limited from performing the material and substantial duties of her regular occupation. Likewise, that she worked for a month does not been she was able to continue performing the material and substantial duties of her job. In fact, she stopped working after January 25 because she believed her medical condition limited her from performing the material and substantial duties of her job. There is no evidence in the administrative record that Whipple could perform without limitation the material and substantial duties of her job as an anesthesiologist. There is no evidence in the record that any one who examined Whipple accused her of faking or malingering.[262] A substantive and procedural requirement of the Plan is to determine whether Whipple was limited from performing the material and substantial duties of an anesthesiologist. Unum's failure to evaluate whether Whipple was limited from performing the material and substantial duties of her regular occupation was inconsistent with this substantive and procedural requirement of the Plan.

> Factor Four:   Whether the administrator's interpretation is consistent with prior interpretations of the same words, or contrary to the Plan's clear language

Unum decided both to pay Whipple's claim and not to pay Whipple's claim based on the very same information. Unum's denial of Whipple's claim after first accepting the claim based on the very

---

[262]See *Pralutsky v. Metropolitan Life Insurance Company*, 435 F.3d 833, 838 (8th Cir. 2006) where the administrator's denial of a claim based on fibromyalgia was upheld, but in which it was said "There may be other cases in which objective evidence simply cannot be obtained, and it would be unreasonable for an administrator to demand the impossible." In Whipple's case a cause has not been diagnosed, but there is no evidence that her complaints of pain are faked or that she is malingering, nor is there any evidence that she can perform without limitation the material and substantial duties of an anesthesiologist. The only evidence in the administrative record about her capacity to perform her job is that she is limited from performing the material and substantial duties of her job as an anesthesiologist.

same information renders the subsequent denial inconsistent with the prior interpretation of the same words when Whipple's claim was accepted.

Factor Five:   Whether the interpretation is contrary to the clear language of the Plan.

The Plan provides that it will pay an insured's claim if the insured is limited from performing the material and substantial duties of her job.   When Unum decided Whipple could perform without limitation the material and substantial duties of her job its conclusion was contrary to the plain language of the Plan's definition of disability which provided that Unum would pay a claim when the claimant is limited from performing the material and substantial duties of her job.[263]   Based on this administrative record, without a vocational evaluation Unum could not have reached the conclusion that Whipple could perform without limitation the material and substantial duties of an anesthesiologist.  Deciding that Whipple was not limited from performing the material and substantial duties of her regular occupation without specifically addressing that issue was contrary to the clear language of the Plan which defined disability.

## ATTORNEY'S FEE

Under 29 U.S.C. § 1132(g) the court has discretion to award a reasonable attorney's fee and costs to either party.

In exercising that discretion, a court should consider the following factors:

(1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of

---

[263]See *Seitz v Metropolitan Life Insurance Company*, 433 F.3d 647, 651 (8th Cir. 2006) for the application of a Plan disability definition which requires the participant to be "totally disabled" from performing "all material aspects of his occupation, not necessarily his own job."  *Sietz's* Plan definition of disability is different from Unum's definition in Whipple's case.  The *Sietz* decision holds "that when a Plan uses an individual's own occupation to determine whether he or she is totally disabled, being able to perform *some* job duties is insufficient to deny benefits." (italics in original).

attorneys' fees against the opposing parties could deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions.[264]

Factors (1), (2), (3), and (5) favor awarding a reasonable attorney's fee to Whipple. Factor (4) weighs against awarding an attorney's fee to Whipple. Whipple is the prevailing party at this stage. Absent her appeal Unum's erroneous denial of benefits would have been unchallenged and that would have been the end of the matter. After considering the *Lawrence v. Westerhaus* five factors Whipple is entitled to a reasonable attorney's fee and costs. Whipple is also entitled to a reasonable attorney's fee and costs because it probably has and probably will cost her more to pursue this matter than the amount of the benefits she might receive upon remand. There is also the risk for her that a vocational assessment on remand will mitigate against an award of LTD benefits to her. That factor weighs heavily on the side of awarding a reasonable attorney's fee because the failure to award a reasonable attorney's fee and costs could forestall persons of lesser means from pursuing a valid claim under similar circumstances, and could contemporaneously hand insurers a lever for denying other valid claims.

It is respectfully RECOMMENDED to the district court:

1.      That Unum's Motion for Summary Judgment (Doc. 63) be DENIED.

2.      That Joy Whipple's Motion for Summary Judgment (Doc. 68) be GRANTED.

3.      That Joy Whipple's claim for benefits be REMANDED to Unum for reconsideration. Upon remand (1) Unum must arrange and pay for a vocational assessment to determine whether Joy Whipple was at pertinent times, or is currently, limited from performing the material and substantial duties of her regular  occupation as an

---

[264]*Lawrence v. Westerhaus*, 749 F.2d 494, 495-96 (8th Cir. 1984) (typographic misspelling corrected).

anesthesiologist; (2) Unum must reconsider and explain what changed between the time Unum first accepted Joy Whipple's claim for payment and the time when Unum determines her claim should be denied; and (3) Unum must accept the March 26, 2010, trigger point findings as objective findings.  Unum also must afford Joy Whipple the opportunity to submit rebuttal evidence and argument before Unum makes a final decision on remand which is adverse to Whipple.

4.      That Joy Whipple be awarded her attorney's fee and costs. Joy Whipple must submit an affidavit to support the fee she claims not later than 20 days after the district court files its decision.  Unum may object to the attorney's fee claim not later than 20 days after Joy Whipple's claim is filed.  Joy Whipple may file a rebuttal brief to Unum's objection, if any, not later than 10 days after the objection is filed.

## NOTICE OF APPEAL

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.  Objections must be timely and specific in order to require de novo review by the District Court.

Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990)
Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

Dated this **30** day of January, 2013.

BY THE COURT:

John Simko
United States Magistrate Judge